**NORTHEAST DATA SYSTEMS, INC., Plaintiff, Appellant,**

v.

**McDONNELL DOUGLAS COMPUTER SYSTEMS COMPANY, Defendant, Appellee.**

No. 92–1690.

United States Court of Appeals, First Circuit.

Heard Nov. 5, 1992.

Decided March 2, 1993.

Rehearing and Rehearing En Banc Denied March 31, 1993.

Roger S. Davis with whom Nancy Pitnof–Mahoney and Davis, Rubin & Parker, P.A., Boston, MA, were on brief, for plaintiff, appellant.

Frederick W. Rose with whom Gianfranco A. Pietrafesa, and Young, Rose, Imbriaco & Burke, P.C., Parsippany, NJ, were on brief, for defendant, appellee.

Before BREYER, Chief Judge, CYR and BOUDIN, Circuit Judges.

BREYER, Chief Judge.

In February 1976, Northeast Data, a Massachusetts firm, entered into a contract with Microdata, a California company. In the contract, Microdata promised Northeast, among other things, that:

1) Northeast would become the "sole distributor" for Microdata's "Reality" line of computer parts and related software in seven Massachusetts counties;

2) Microdata would properly service "Reality" products after Northeast Data sold them to end users;

3) Microdata would supply proper spare parts; and

4) Microdata would pay Northeast a 10% commission on any "Reality" products that Microdata sold directly to end users in Northeast's territory.

The parties' relationship subsequently deteriorated. And, in January 1983, Microdata, claiming that Northeast had failed to meet its contractual purchasing quota, terminated the distributorship.

Northeast then brought this diversity action (filed in state court then removed to federal court) against Microdata. In its original complaint Northeast essentially said that Microdata had broken its agreement (1) by failing to supply enough, or adequately trained, servicing personnel; (2) by failing to supply enough, or adequate, supply parts; (3) by failing to pay many 10% commissions when due; (4) by marketing what were essentially "Reality" products under different names, through other dealers; and (5) by charging Northeast higher prices than it charged other dealers. Northeast later amended its complaint to add a "deceit" claim that Microdata had failed to disclose material information during contract negotiations, namely that Microdata was selling Reality products, and would continue to sell them, to a company called ADP, which (according to Northeast) was both a "Reality" end user and a competing dealer. In Northeast's view these actions and omissions broke both explicit and implicit terms of the contract, amounted to "fraud," and violated various statutes, which, with the exception of Massachusetts' "unfair trade practices" statute, are not relevant here. *See* Mass.Gen.L. ch. 93A.

The parties tried the contract and fraud issues to a jury, with the magistrate reserving the claim of violation of Chapter 93A. The jury found that Microdata had wrongfully terminated the distributorship; that it had broken explicit terms in the contract by failing to pay commissions on "end user" sales to ADP; and that it had broken an implicit covenant of "good faith and fair dealing" (either by failing to pay commissions on other sales, by failing to supply proper parts or service, or both). It awarded Northeast approximately $1.7 million damages. The jury also found that Microdata had fraudulently induced Northeast to enter the contract by failing to tell Northeast about its ADP sales; but the

jury refused to award any damages on that claim.

The magistrate then turned to the reserved Chapter 93A claim. He noted that Northeast and Microdata had agreed, while the case was pending, to try the contract and "fraud" claims under California law. He reasoned that the 93A claims so closely resembled the contract and fraud claims that the parties must have agreed "implicitly" to try those claims under California law as well. He concluded that, since California has no 93A-type of law, he must dismiss Northeast's 93A claims. Northeast now appeals that dismissal. *See* 28 U.S.C. §§ 1291, 636(c)(3) (appeal from order of a magistrate judge).

■ For purposes of this appeal, we have assumed (without deciding) that Northeast is correct when it says that it neither explicitly nor implicitly agreed, during the course of this litigation, that California law would govern its 93A claims. Nonetheless, Northeast did agree, in the contract itself, that

> This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of California.

In our view, Northeast's Chapter 93A claims (with one exception) fall within this contractual choice-of-law provision.

Northeast describes its Chapter 93A claims and, most importantly, the alleged facts that underlie them in an 82 page document, filed with the magistrate, called "Plaintiff's Request for Findings of Fact and Rulings of Law on Chapter 93A Damages." Our review of the facts alleged in that document makes clear that (as we said, with one exception) Northeast's 93A claims amount to embroidered "breach of contract" claims. *See Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir.1990) (breach of implied covenant claims are breach of contract claims); *Restatement (Second) of Contracts* § 176, comment e (1981). In four instances Northeast simply says that Microdata "knowingly" or "willfully" broke the contract by (1) failing "to provide" proper "field service and support;" (2) failing to deliver goods when and as promised; (3) selling goods outside the "sole distributorship" without paying com-

missions; and (4) wrongfully terminating the contract. In three other instances Northeast says that Microdata threatened to take actions that the contract forbids, with a bad motive, namely to force Northeast to give up certain contract rights, such as its exclusive Reality distributorship. Those badly motivated threats (as far as the document reveals) threaten actions that Microdata might legally have taken had there been no contract, for they consist of claims that Microdata threatened (1) to deny Northeast the right to sell certain "Reality" products (such as a product called "Sequel"); (2) to sell a competing product (called "CMC") in Northeast's exclusive territory; and (3) (in unspecified ways) to stop Northeast from meeting its contract-imposed buying quota.

Of course, the allegations that Microdata acted "willfully" or "knowingly" or with a bad motive add something to the pure breach of contract claims. Indeed, Northeast hopes they provide the element of "rascality" needed to bring a claim of breach of contract within the statute. *Compare Pepsi–Cola Metropolitan Bottling Co., Inc. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir.1985) (simple breach of contract does not violate Chapter 93A) *with Wang Laboratories, Inc. v. Business Incentives Inc.*, 398 Mass. 854, 501 N.E.2d 1163 (1986) (bad faith contract termination states a Chapter 93A claim) *and Levings v. Forbes & Wallace, Inc.*, 8 Mass.App. 498, 396 N.E.2d 149 (1979) (93A violations must involve "rascality"). But, the relevant question here is whether those additional "state of mind" or "bad motive" allegations (together with other, less significant bits of embroidery) take these claims outside the scope of contractual language that says California law will govern "the rights and obligations of the parties" in respect to the "Agreement." We find that they do not.

The contract violations are essential elements of the 93A claims. The "state of mind" and "bad motive" allegations add little. Given the language of the contract's choice-of-law provision (applying California law to "rights and obligations" arising out of, or imposed by, the "Agreement"), would it not seem surprising to find that Massachusetts law, not California law, gov-

erned these claims? In the absence of any contrary evidence, we believe that, when parties agree that "contract related" claims will be tried under, say, the law of California, they do not mean that a claim of "serious" or "rascal-like" breach of contract will be tried under the law of Massachusetts.

Moreover, the Massachusetts Supreme Judicial Court has recognized that, under some circumstances, a Chapter 93A claim "is essentially duplicative of a traditional contract claim." *See Canal Electric Co. v. Westinghouse Electric Corp.*, 406 Mass. 369, 548 N.E.2d 182, 187 (1990). That court has permitted plaintiffs to obtain separate Chapter 93A attorneys' fees in such circumstances, but it has denied plaintiffs "double recovery" on both a breach of contract claim and a 93A claim arising from the same breach. *See Linthicum v. Archambault*, 379 Mass. 381, 398 N.E.2d 482 (1979). These Massachusetts decisions support our natural reading of the scope of the contract's choice-of-law provision, for they acknowledge that, depending on the facts, a Chapter 93A claim may essentially reduce to a contract claim. One federal district court has reached the same conclusion we reach with respect to a similar contract clause. *See Scheck v. Burger King Corp.*, 756 F.Supp. 543, 545–46 (S.D.Fla.1991) (clause which says franchise agreement "shall be governed and construed under and in accordance with the laws of the State of Florida" applies to bar Massachusetts 93A claims which incorporate contract claims and would not exist without the agreement).

We have found one district court case in Illinois that reaches a different result. *Fleet Mgt. Systems, Inc. v. Archer–Daniels–Midland Co., Inc.*, 627 F.Supp. 550 (C.D.Ill.1986). That district court reasoned that *any* violation of Chapter 93A is a "tort" and therefore no alleged Chapter 93A violation could fall within the scope of a contractual choice-of-law provision that talks about "contracts." *Id.* at 561–62. This reasoning, however, seems to exalt pleading form over fact-related substance. Such reasoning would undermine the parties' choice of law agreement by permitting one of them, through artful pleading, to bring what is little more than a breach of contract claim, under law that both parties have agreed would not apply.

The Illinois case relied upon a Massachusetts district court case, *Computer Systems Engineering, Inc. v. Qantel Corp.*, 571 F.Supp. 1365 (D.Mass.1983), a case very different from the present one. *Qantel* concerned a 93A claim that was *not*, in essence, a breach of contract claim, for the plaintiff there did not claim that the defendant *broke* a contract, but rather that the defendant fraudulently *induced* the plaintiff to *form* the contract in the first place. *See id.* at 1367 (Chapter 93A claim partially based on fraudulent inducement); *see also id.* at 1370 (because tort-like claims predominate over contract-like claims in compound 93A claim, 93A claim is outside parties' agreement); *cf. Popkin v. National Benefit Life Insurance Co.,* 711 F.Supp. 1194, 1201–02 (S.D.N.Y.1989) (Chapter 93A tort claim alleging fraudulent misrepresentations to third party with whom plaintiff had a different contract falls outside choice-of-law clause in agency agreement between plaintiff and defendant). Insofar as *Qantel* contains dicta, *Qantel,* 571 F.Supp. at 1371, that *might* be read to mean that *every* Chapter 93A claim must be viewed as a tort claim, no matter *how* clearly it resembles a claim of breach of contract, those dicta do not express our view of Massachusetts law.

We conclude that the parties, in their choice-of-law provision, meant that California law would govern both ordinary and "rascal-like" breach of contract claims. We believe that the "rascal-like" claims before us fit within that provision. In the absence of a conflict with public policy, Massachusetts honors choice-of-law provisions in contracts, *Morris v. Watsco, Inc.,* 385 Mass. 672, 433 N.E.2d 886, 888 (1982), and, in this diversity case, so must we. *Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 375 (1st Cir.1991). There is no conflict with Massachusetts public policy here. The "dispute is essentially a private one," which, unlike, say, an antitrust dispute, has no third-party effects. *Cf. Canal Electric,* 548 N.E.2d at 187–88 (corpora-

tions may waive protection of 93A by contractual limitation of liability clause).

■ We turn now to the one further 93A claim that we called an "exception." That special claim rests upon allegations of fraud, not breach of contract. Northeast says that Microdata, when negotiating the contract, failed to disclose that it was currently selling Reality systems to ADP, a firm that does business in Northeast's distributorship area, and that it intended to continue selling to ADP even after the contract was in effect. Northeast says that this course of conduct amounts to a "fraud" that falls within the scope of Chapter 93A. Because this claim concerns the validity of the *formation* of the contract, it cannot be categorized as one involving the rights or obligations arising under the contract. Hence, the claim falls outside the contract's choice-of-law provision. *See Qantel*, 571 F.Supp. at 1372.

■ Nonetheless, Microdata, in its brief, refers us to the docket sheet, which notes that Northeast agreed, in a settlement, to stipulate that "none of" Microdata's "actions w[ith] r[eference] t[o] ADP can form the basis of liability." A district court memorandum confirms that, as part of the consent judgment, Northeast "agreed that if the Court of Appeals should reverse the judgment dismissing plaintiff's Chapter 93A claim (Count X of the Second Amended Complaint), plaintiff will not press as part of that claim any of the defendant's actions with respect to ADP." The appeal, with respect to this remaining ADP claim, therefore is moot. *See Pontarelli v. Stone*, 978 F.2d 773, 775 (1st Cir.1992) (settlement of merits of underlying claims moots appeal).

Finally, we note that Northeast, in its 82 page document, at one point alleges in a single sentence that Microdata violated Chapter 93A by "filing and prosecuting frivolous and meritless counterclaims and affirmative defenses, without any attempt to introduce any evidence to support same at the trial of this action." Because Northeast does not separately press this claim on appeal, we suspect that it has been abandoned. But, if it has not, we simply point out that a claim of "abuse of process" with

nothing more does not state a violation of Chapter 93A. *See Quaker State Oil Refining v. Garrity Oil Co.*, 884 F.2d 1510, 1514 (1st Cir.1989) *and cases cited therein* (filing legal claim which proves baseless not in itself an unfair trade practice, except where claim brought with ulterior motive).

For these reasons, the magistrate's order dismissing the Chapter 93A claims is

*Affirmed.*