# United States Court of Appeals
## For the First Circuit

No. 13-1976

MICHAEL DINAN,

Plaintiff, Appellant,

v.

ALPHA NETWORKS, INC.

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Kayatta, Circuit Judges.

Patrick S. Bedard, with whom Bedard & Bobrow, P.C. was on brief, for appellant.
Daniel P. Schwarz, with whom Jackson Lewis, P.C. was on brief, for appellee.

August 20, 2014

**KAYATTA, Circuit Judge**. Michael Dinan, a resident of Maine, began working for California-based Alpha Networks as a salesman in 2005 pursuant to a written employment agreement. In 2010 Dinan ceased working for Alpha because of a dispute over how much he was entitled to be paid in commissions. Litigation followed. A jury ultimately found that the written agreement included no promise to pay Dinan commissions on sales after 2008, but that Dinan was entitled to quasi-contract damages in the amount of $70,331.93 for sales made in 2009 and 2010. The question then remained whether to treble those damages and award attorneys' fees under Maine's wage payment law, or instead to add on to the damage award only liquidated damages of $7,799.97 under California law. Finding the question to be a close one, the district court opted to rely on a choice-of-law provision in the written agreement calling for application of California law in certain disputes. Agreeing that determining the correct choice of law on this unusual record is not straightforward, we nevertheless find that Maine's highest court would most likely deem Dinan entitled to the full array of remedies set forth in Maine's wage payment law. We therefore vacate the award and remand the case so that the district court can treble damages, calculate interest, and entertain a request for attorneys' fees under Maine law.

# I. Background

The parties do not dispute the basic facts on appeal. Alpha is a California-based designer and manufacturer of modems, routers, switches, and other computer hardware. Rather than market its products under its own brand, Alpha is a "white-label" manufacturer, selling to other companies who market the devices under their brand names. Dinan's job was to sell Alpha's devices to those brands. When Dinan joined Alpha in 2005, he lived in Portland, Maine. Though he initially thought he might have to move to Boston, Alpha ultimately concluded that he could work from Maine. Prior to commencing work for Alpha, Dinan signed a letter from Alpha specifying the terms of his employment ("the 2005 agreement") which provided that Alpha would pay him, in part, based on a specified commission structure.

After he joined Alpha, Dinan spent his first week and a half in California learning about Alpha and its products. Thereafter he worked from his home in Portland except when he traveled to meet customers in other states, including Texas, Alabama, and Massachusetts. In 2008, Alpha sent an email to Dinan containing a new commission structure ("the 2008 compensation plan"). Dinan thought that the 2008 compensation plan was likely to compensate him less than the commission structure in the 2005 agreement. He expressed his unhappiness to his bosses and, according to his trial testimony, was promised a new compensation

plan for sales in 2009, though he was not promised that it would provide him with better terms than the 2008 compensation plan. No new compensation plan was ever announced.

Dinan left Alpha in March 2010, having received no commissions on his sales in 2009 or 2010 aside from a $4,000 payment that he received in December of 2009. Shortly thereafter, Dinan filed suit in Maine state court. After Alpha removed the case to federal court it proceeded to trial. At trial, the jury was asked to consider, among other things, Dinan's claims for breach of contract and, alternatively, for so-called quasi-contract damages. The jury concluded that Dinan had not "established that Alpha . . . and he entered into an employment agreement in which Alpha . . . promised to pay him commissions for 2009 and 2010." It nevertheless also found that Dinan had "established that he [was] entitled to damages under quasi-contract," that the amount of those damages was $70,331.93, and that he had "established that Alpha . . . failed to pay [him] his wages, including commissions."

After trial the parties disagreed about which state's law governed whether and to what extent the jury's award of damages should be augmented with additional remedies. Under California law, the parties agree, Dinan would be entitled to 30 days' wages (which the jury valued at $7,799.97) as liquidated damages in addition to the $70,331.93 in compensatory quasi-contract damages awarded by the jury. See Cal. Lab. Code § 203. The parties also agree that, under

-4-

Maine law, Dinan would be entitled to a liquidated damages award of double his compensatory damages, equaling an additional $140,663.86, as well as attorneys' fees and costs. <u>See</u> Me. Rev. Stat. tit. 26, § 626. The district court found that California law applied. Dinan also argued unsuccessfully below that he was entitled to pre-judgment interest on any liquidated damages he was awarded. <u>Id.</u>

## II. Standard of Review

This appeal presents exclusively questions of law, not fact or discretion, hence our review is de novo. <u>See, e.g.</u>, <u>Robidoux</u> v. <u>Muholland</u>, 642 F.3d 20, 22 (1st Cir. 2011). With jurisdiction in the District of Maine resting solely on diversity of citizenship, we answer these substantive questions of law as we expect Maine's highest court, its Law Court, would answer them. <u>See, e.g.</u>, <u>Samaan</u> v. <u>St. Joseph Hosp.</u>, 670 F.3d 21, 29 (1st Cir. 2012).

## III. Discussion

### A. The Choice of Law Question

Resolving the choice-of-law issue central to this appeal begins with considering the parties' 2005 agreement specifying the original terms of Dinan's employment. That agreement included the following clause:

> The terms of this letter shall be governed by and construed and enforced in accordance with the laws of the State of California, without giving effect to any choice or conflict of law provision or rule (whether of the State of California or any other jurisdiction) that would

-5-

> cause the application of the laws of any jurisdiction other than the State of California. Any term or provision of this letter agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

See Dinan v. Alpha Networks Inc., 957 F. Supp. 2d 44, 54 (D. Me. 2013). Under Maine law, this choice of law provision would govern a claim for breach of the 2005 agreement unless (1) California had no substantial relationship to the parties or the transaction or (2) applying California law would be contrary to "a fundamental policy of a state which has a materially greater interest" than California as to the "determination" of this particular issue. Schroeder v. Rynel, Ltd., 720 A.2d 1164, 1166 (Me. 1998); Restatement (Second) of Conflict of Laws § 187 (1971).

Alpha in fact sought to build its defense at trial on the foundation of the 2005 agreement. It argued that the 2008 compensation plan was a modification of the 2005 employment agreement, that Dinan accepted the modification by continuing to work for Alpha, and that the 2005 agreement, as modified by the 2008 compensation plan, set forth the terms of Alpha's promise to pay commissions for 2009 and 2010. Consistent with this approach, Alpha agreed to a jury instruction as follows:

> The parties have presented evidence of a 2005 compensation plan and a 2008 compensation plan. If you determine that an agreement was in force in 2009 and 2010, you must determine the terms of that agreement. Alpha contends that a 2008 compensation plan modified the

-6-

2005 employment agreement. An employee who continues to work for his employer after the employer has given notice of changed terms and conditions of employment has accepted the changed terms and conditions. If you find the 2008 plan was in place during 2009 and 2010, you may find that Mr. Dinan is entitled to compensation under that plan.

This was a seemingly solid argument, but the jury rejected it. The jury found that Alpha and Dinan had no agreement that Alpha would pay commissions for 2009 and 2010. In one respect, this meant that Alpha won the breach of contract claim. In another respect, though, the jury's verdict is more clearly read as a finding that the 2005 agreement simply did not govern the terms of the parties' relationship in 2009 and 2010 (i.e., in the words of the district court's instruction, it was not "in force in 2009 and 2010").

The verdict form, accordingly, required the jury to proceed further and consider an alternative claim of "quasi-contract" if it found that there was no promise in an employment agreement to pay commissions for 2009 and 2010. The jury verdict for Dinan thus rested entirely upon a claim for "breach of a quasi-contract." The jury instructions, to which Alpha did not object, stated as follows:

Mr. Dinan claims that even if he did not have a valid contract with Alpha that entitled him to bonuses, he is entitled to payment for the services he rendered. This amounts to a claim that he and Alpha had a quasi contract.

To prove a claim of breach -- for breach of a quasi contract, Mr. Dinan must prove by a preponderance of the evidence that: One, he rendered services to Alpha; two, the services were rendered with Alpha's knowledge and

-7-

consent; and, three, the services were rendered under
circumstances that make it reasonable for the plaintiff
to expect payment.

In finding Alpha liable on this theory alone, the jury found Alpha independently liable not by force of promise, but by virtue of knowingly having accepted services "under circumstances that make it reasonable for [Dinan] to expect payment."

This brings us back to the choice-of-law clause in Alpha's letter to Dinan that constituted the 2005 agreement. While Alpha claims that the clause governs "disputes about the parties' employment relationship," it is in fact narrower than that. It states only that "[t]he terms of this letter" are to be "governed by and construed and enforced" under California law. The question of what fair compensation is due Dinan under a quasi-contract theory calls for no construction or enforcement of the terms of that letter. Rather, instead of telling the jury to calculate damages based on a reading of the 2005 agreement, the court (again without challenge) told the jury to determine "the reasonable value of the services."

Alpha also argues that what really happened here is that the jury came up with a missing term of the 2005 agreement (i.e., a compensation plan for 2009 and 2010). Such an approach certainly would have made much sense in the abstract. The problem is that the jury clearly found no breach of any promise of any type, whether express or implied, under the 2005 agreement, instead effectively

finding that the agreement simply did not deal with 2009 and 2010 commissions. And the 2005 agreement on its face disavows having any unexpressed terms, stating that it "form[s] the complete and exclusive statement of [Dinan's] employment with [Alpha]." In any event, since Alpha agreed that the jury could consider a claim for breach of quasi-contract even where the parties had an actual contract, and since the jury found no breach of any promise in the 2005 agreement, it cannot now say that the jury should only have been allowed to hold it liable for a breach of a term of the 2005 agreement, whether express or "missing."

In sum, the parties' 2005 choice-of-law agreement about the law to be applied in construing and enforcing the 2005 agreement does not apply to a duty that, the jury found, arose outside of that agreement. And while Alpha argues that the jury's verdict seems hard to reconcile with the facts, Alpha has filed no cross-appeal challenging either the jury instructions or the jury's finding on the quasi-contract claim, and so we must accept that finding of liability as a given.

Anticipating that we might find that the choice-of-law provision in the 2005 agreement does not directly apply to Dinan's quasi-contract claim, Alpha advances two arguments for applying the choice-of-law agreement indirectly. First, it argues that because quasi-contract claims are a type of contract claim, we should apply to the quasi-contract claim the same choice of law that the parties

agreed would apply to a claim for breach of the 2005 agreement. While we agree with Alpha that a quasi-contract claim shares much in common with a breach of contract claim, see Paffhausen v. Balano, 708 A.2d 269, 271 n.3 (Me. 1998), it does not follow that a choice-of-law clause in the 2005 agreement must therefore apply to any issues arising under the quasi-contract claim.  For example, even if parties have two actual contracts, only one of which has a choice-of-law clause concerning its enforcement, there is no reason simply to assume that the choice-of-law clause also applies to the second contract.  Instead, we would likely infer that the parties left out such a clause in the second contract because they did not want it.  Here, similarly, given the fact that the parties did not agree to a broad choice-of-law clause covering all dealings they might have, it makes sense to infer just the opposite of what Alpha would have us infer.

Second, Alpha also points to decisions that apply contractual choice-of-law provisions to non-contract claims that are related to a contract brought by one party to the contract against the other.  See Ne. Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co., 986 F.2d 607, 610 (1st Cir. 1993) ("[W]hen parties agree that 'contract related' claims will be tried under, say, the law of California, they do not mean that a claim of 'serious' or 'rascal-like' breach of contract will be tried under . . . Massachusetts [General Laws Chapter 93A]."); Stonyfield Farm, Inc.

v. <u>Agro-Farma, Inc.</u>, 08-CV-488, 2009 WL 3255218 at *6 (D.N.H. Oct. 7, 2009) (applying contractual choice-of-law provision to tort claims predicated on breach of contract). It is precisely this argument that tipped the balance (albeit with "some hesitation") for the able district court judge. <u>Dinan</u> v. <u>Alpha Networks Inc.</u>, 957 F. Supp. 2d 44, 55 (D. Me. 2013). If Dinan's claim called for enforcing obligations arising from the terms of the 2005 agreement (even using non-contract theories), this argument would get to first base. Here, though, the obligation being enforced would have existed even had there never been a contract. In other words, while the concept of quasi-contract liability is certainly related to the concept of liability for breach of contract, the specific implied agreement found to exist here does not rest on the 2005 agreement between the parties that is the sole subject of the choice-of-law clause. It is, in short, not a "breach-of-the-2005-agreement-plus" claim; it is an "even-though-no-breach-of-the-2005-agreement" claim.

Having thus rejected the argument that the 2005 agreement resolves the choice-of-law issue, we must look elsewhere to determine what law applies to enforcing the free-standing, implied obligation upon which the jury rested its verdict. Maine law provides no certain answer. While we might therefore certify the question to Maine's Law Court pursuant to Maine Revised Statutes title 4, section 57, neither party so requests, the case has already

-11-

once taken such a detour to resolve a question of state law,[1] and our analysis, described below, leaves us sufficiently confident that our own answer accurately predicts how the Law Court would resolve this question.

To determine what state's law applies to enforcing the so-called quasi-contract, Dinan points to section 196 of the Restatement (Second) of Conflict of Laws (1971), which states:

> The validity of a contract for the rendition of services and the rights created thereby are determined, in the absence of an effective choice of law by the parties, by the local law of the state where the contract requires that the services, or a major portion of the services, be rendered, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which the event the local law of the other state will be applied.

Comment b to section 196 explains further that:

> The importance in the choice-of-law process of the place where the services, or a major portion of the services, are to be rendered . . . enjoys greatest significance when the work is to be more or less stationary and is to extend over a considerable period of time. This is true of a contract for employment on the ordinary labor force of a particular factory. By way of contrast, the place where the services are to be rendered is of lesser importance when the services are to be of relatively brief duration, such as when a workman is employed to do a minor repair job in a given state, or when the employee's duties will require him to travel with fair frequency between two or more states.

---

[1] The district court certified to the Law Court the question of whether Maine's wage payment statute, Me. Rev. Stat. tit. 26, § 626, is applicable to quasi-contract damages. See Dinan v. Alpha Inc., 60 A.3d 792 (Me. 2013).

Maine has not expressly adopted section 196, but there is no reason to think it would not look to section 196 in the absence of any Maine precedent to the contrary. See Schroeder v. Rynel, Ltd., 720 A.2d 1164, 1166 (Me. 1998) (collecting "past [Maine] decisions favoring the use of the Restatement to resolve choice of law disputes").

Alpha does not directly respond to Dinan's reliance on section 196. Indeed, it does not even mention section 196 in its brief. It does argue in a footnote, however, that although Dinan made his calls from his home in Maine, Alpha performed its obligations from California. Section 196, though, looks primarily to where the party rendering services renders those services, not to where the party paying for the services operates.

We recognize that section 196 applies to contracts, making no mention of quasi-contracts. However, Maine law (pursuant to which we undertake this conflict-of-law inquiry, see, e.g., Butler v. Balolia, 736 F.3d 609, 612 (1st Cir. 2013)) recognizes that quasi-contract claims "involve[] recovery for services or materials provided under an implied contract." Paffhausen v. Balano, 708 A.2d 269, 271 (Me. 1998). While a quasi-contract involves no actual agreement, the parties here bear the same relationships to Maine and California, and have behaved toward each other, for the most part, as they would have if they had a contract governing payment of commissions for 2009 and 2010. Nor is there any other section of

-13-

the Restatement more applicable to a quasi-contract claim than section 196.  In short, the logic underlying section 196 supports the application of the same principles to quasi-contract clams.

We have also reviewed the record as a whole, noting that Dinan's customers were mostly or entirely located outside of Maine. There is no indication, though, that services were rendered more frequently in any of those states than they were from Dinan's home base in Maine.  Indeed, Dinan presented uncontested testimony that "most of [his] work and time was spent in Maine."  To the extent that the applicability of section 196 is nevertheless unclear in this oddly posed case, the very nature of Maine substantive law aligns with section 196's focus on the place where services are rendered by the employee.  Maine's wage payment law, Me. Rev. Stat. tit. 26, § 626, manifests on its face a legislative intent to protect employees from employers who fail to pay wages.  We doubt that Maine's highest court would find that a company procuring services from a Maine resident performed mostly in Maine can avoid compliance with Maine's fair wage laws merely because the company procuring the services conducts its own operations outside of Maine.

For all of the foregoing reasons, we find that Maine substantive law governs enforcement of the quasi-contractual relationship found to exist between the parties in 2009 and 2010.

**B.        Pre-Judgment Interest on Liquidated Damages**

-14-

Dinan has preserved for review his argument, rejected by the district court, that prejudgment interest should be calculated on the basis of his entire judgment for unpaid wages and liquidated damages, rather than just on the basis of the unpaid wages. The wage payment statute itself states that:

> An employer found in violation of this section is liable for the amount of unpaid wages and, in addition, the judgment rendered in favor of the employee or employees must include a reasonable rate of interest, an additional amount equal to twice the amount of those wages as liquidated damages and costs of suit, including a reasonable attorney's fee.

Me. Rev. Stat. tit. 26, § 626.[2] Section 626-A, which governs generally penalties for violating a number of statutory rules governing the payment of wages, including section 626, contains almost identical language.[3] This formulation implies, but by no means dictates, that interest is assessed first, before adding

---

[2] In answering the district court's certified question, the Law Court held that section 626 is applicable to quasi-contract damages if "the services rendered . . . are of the type for which an employee would have been due wages." Dinan, 60 A.3d at 797. Alpha does not dispute on appeal that the district court was correct to conclude that section 626 therefore applies to Dinan's quasi-contract damages.

[3] Specifically it reads in relevant part:

> Upon a judgment being rendered in favor of any employee or employees, in any action brought to recover unpaid wages or health benefits under this subchapter, such judgment includes, in addition to the unpaid wages or health benefits adjudged to be due, a reasonable rate of interest, costs of suit including a reasonable attorney's fee, and an additional amount equal to twice the amount of unpaid wages as liquidated damages.

-15-

liquidated damages.  On the other hand, Maine's general prejudgment interest statute, Me. Rev. Stat. tit. 14, § 1602-B(1)-(3), provides broadly, with limited exceptions not here applicable, for prejudgment interest in civil actions, and refers to interest on the judgment, not a portion of the recovery making up the judgment.

The issue thus posed is whether the general rule of section 1602-B is trumped by the implied limitation one might, but need not, infer from the language of sections 626 and 626-A.  The district court found that sections 626 and 626-A did indeed limit an award of prejudgment interest to the actual damages portion of the judgment, and that this implied limitation, rather than the general rule of section 1602-B, controlled.  On balance, we disagree.

Chronology guides our analysis.  Section 1602-B (formerly section 1602) contains the background rule that predated the current

version of 626 and entirely predated section 626-A.[4]  It is structured as a general rule that applies to all actions other than certain actions expressly excepted.  It applies as well to all damages, even punitive damages.  See Haworth v. Feigan, 623 A.2d 150, 159 (Me. 1993).  Sections 626 and 626-A, as thereafter enacted, contain no language expressly indicating any intention to create a new exception to the general rule.  Furthermore, when the legislature later amended section 1602-B to add, in section 1602-B(1), a new exception to the general rule (for small claims actions)

---

[4]  Prior to 1975, section 626 read simply:

> Any employee, leaving his or her employment, shall be paid in full within a reasonable time after demand at the office of the employer where payrolls are kept and wages are paid.  Whoever violates any of the provisions of this section shall be punished by a fine of not less than $25 nor more than $50.

1975 Me. Laws 724.  In 1975 section 626 was revised to add the language about prejudgment interest that it contains today.  Also in 1975, section 626-A was first enacted containing the same language about prejudgment interest that it contains today.  At that time section 1602 read:

> In all civil actions, except those actions involving a contract or note which contract or note contains a provision relating to interest, interest shall be assessed from the date on which the complaint is filed in court, provided that if the prevailing party at any time requests and obtains a continuance for a period in excess of 30 days and the losing party at no time requests and obtains a continuance, interest will be assessed from the time of entry of judgment. From and after date of judgment, interest shall be allowed at the rate of 10% per year.

Me. Rev. Stat. Ann. tit. 14, § 1602 (West 1972).

-17-

and, in section 1602-B(5), a provision that allows a trial court to waive prejudgment interest for good cause, it did not add an exception covering wage payment claims or liquidated damages. Of course, an alternative reading of this chronology is possible. One could argue that the legislature, in amending section 1602-B, did exempt liquidated damages in wage payment actions because it regarded section 626 as already creating such an exemption. Such an argument, though, places a great deal of weight on the notion that, merely by listing interest second in the litany of remedies, section 626 created such a new--and unusual--exemption from a long-standing general rule. It seems unlikely, too, that merely by adding interest to the list of remedies available in wage payment actions the legislature intended to subtract from the scope of the remedies independently available under section 1602-B. We think it more likely that in enacting section 626-A, the legislature focused on section 626-A, and wanted to be sure interest was available.

Our conclusion finds more support, albeit indirectly, in Avery v. Kennebec Millwork, Inc., 861 A.2d 634 (Me. 2004). Avery addressed an analogous issue: Might one infer from section 626's grant of interest at a "reasonable rate" an exception to section 1602-B(3)'s general rule providing for a particular (and relatively high) rate ("the one-year United States Treasury bill rate plus 3%")? The Law Court answered "no," finding the general rule of section 1602-B controlling. Id. at 636. Even more

significantly, in so ruling the Law Court stressed that section 1602-B "applies to <u>all</u> civil actions except [the listed exceptions]," and that an action under section 626 is a "civil action." <u>Id.</u> at 636 (emphasis in original). And while the Law Court did not expressly address the question posed here, it did expressly and without qualification order that "the clerk . . . should calculate the interest on the judgment . . . in accordance with 14 M.R.S.A. § 1602-B." <u>Id.</u> The judgment included both compensatory and liquidated damages. In short, even without prompting by the parties, or the trial court (which itself appeared to have assessed interest on only the actual wages, <u>id.</u> at 636 n.2), the Law Court in <u>Avery</u> nevertheless appears to have presumed that in a wage payment action interest is calculated under § 1602-B based on the entire judgment, including all damages.

More generally, Maine recognizes that one purpose of prejudgment interest is to "encourage[] the defendant to conclude a pretrial settlement of [a] clearly meritorious suit[]." <u>Jasch</u> v. <u>Anchorage Inn</u>, 799 A.2d 1216, 1219 (Me. 2002) (internal quotation marks omitted). Prejudgment interest furthers this purpose by reducing the benefit of delay to a defendant (and simultaneously preserves the real economic value of the entire claim). This purpose is undercut if prejudgment interest runs only on part of the judgment.

Finally, even if section 1602-B controls, the trial court still retains the discretion to waive prejudgment interest on all or part of the judgment. See § 1602-B(5) ("On petition of the nonprevailing party and on a showing of good cause, the trial court may order that interest awarded by this section be fully or partially waived."). Familiar with how and why a case went to trial, the respective positions of the parties, and the size of the liquidated damages, a trial judge can exercise this discretion to eliminate any actual unfairness from the availability of prejudgment interest on liquidated damages in any particular case.

Confident enough in the foregoing analysis to reverse the contrary ruling of the district court, we nevertheless make no claim that the correct answer is clear. To the contrary, we considered certifying the issue to the Law Court, deciding not to do so because no party so requested, the case has already traveled that route once, and we do not want the tail to wag the dog as the plaintiff still awaits receipt of even his wages. Certainly nothing in our decision can prevent Maine's courts from settling on a different answer in the many wage payment claims that come before them. Until and unless Maine's courts so conclude, however, our best judgment is that prejudgment interest applies, as in Avery, to the judgment.

## IV. Conclusion

For the foregoing reasons we <u>vacate</u> the judgment of the district court and remand the case for further proceedings consistent with this opinion.  Costs are awarded to Dinan.

<u>So ordered.</u>